ALBERT M. TODD v. THE BOARDS OF ELECTION COMMISSIONERS OF KALAMAZOO, CALHOUN, BRANCH, EATON, AND HILLSDALE COUNTIES.

*Elections—Constitutional law — Printing names of candidates on official ballot.*

1. Act No. 17, Laws of 1895, which makes it unlawful for the board of election commissioners to cause to be printed in more than one column on the official ballot the name of any candidate who shall have received the nomination by two or more parties or political organizations for the same office, is valid, and within the power of the Legislature, acting under the provisions of article 7, § 6, of the Constitution, which provides that "laws may be passed to preserve the purity of elections, and guard against abuses of the elective franchise."

2. Said act is not retroactive, and is not applicable where the time within which the candidate is authorized by the act to exercise his choice of tickets had expired before the act took effect.

*Mandamus.* Argued March 23, 1895. Granted March 25, 1895.

Relator applied for *mandamus* to compel respondents to place his name upon the official ballot in three different

columns as candidate for Congressman.     The facts are
stated in the opinions.

*Myron H. Walker* (*E. M. Irish* and *Howard & Roos*, of
counsel), for relator.

*Fred A. Maynard*, Attorney General (*Moses Taggart*, of
counsel), for respondents.

LONG, J.     The relator was nominated on February .28,
1895, as a candidate for Representative in Congress by the
Prohibition party for the Third congressional district of
Michigan, and on March 7 he was nominated for the
same office by the Free Silver party.   On February 27 the
People's party nominated one Robert McDougall for the
same office.   On March 8 Robert McDougall withdrew as
a candidate upon the People's party ticket, and the relator
was substituted in his stead by the congressional committee
of the People's party, such committee certifying that they
were authorized by the convention to fill any vacancy upon
such ticket.   Certificates were filed with the election com-
missioners, March 7, 8, and 9.   The relator claims that
he has the right, under Act No. 190, Laws of 1891, to
have his name printed upon each of these three tickets.

On March 14, 1895, an amendatory act was passed by
the Legislature to the election law, and given immediate
effect, and respondents claim that under the terms of this
amendatory act the relator is not entitled to have his name
appear more than once upon the official ballot.[1]   This
amendatory act provides that—

"It shall be unlawful for said board of election com-
missioners to cause to be printed in more than one column
on the ballot the name of any candidate who shall have
received the nomination by two or more parties or political
organizations for the same office."

---

[1] Act No. 17, Laws of 1895.

The act contains further provisions, relating to the manner in which a choice is to be made by the candidate as to the place which his name shall have on the ballot as follows:

"Any person so receiving the nomination for the same office by two or more parties or political organizations shall, within five days after his name has been certified to said election commission as having been nominated by two or more political parties for the same office, give notice to the board of election commissioners of each county in the State, if said nomination be for a State office, and to the board of election commissioners of each county in the district, if said nomination be for a congressional, judicial, or legislative office, and to the board of election commissioners of the county, if such nomination be for a county office, specifying in such notice the column of which party or political organization on the ballot he wishes his name to be printed, and said board of election commissioners shall print the name of such candidate in such column on the ballot so specified by him, and in no other column. Such notice shall be given to said election commissioners by delivering the same either in person or by depositing the same in the postoffice, in a sealed envelope, with postage prepaid, directed to the chairman of such board of election commissioners at the county seats of the respective counties:     *Provided* further, that in case any such candidate so nominated by two or more parties or political organizations for the same office, and whose name shall have been certified by the chairman and secretary of the committees of such parties or political organizations to said board of election commissioners within the time and as above provided, shall refuse or neglect to give notice to said board of election commissioners as above provided, and within the time above named, specifying in which column on the ballot he wishes his name to be printed, then and in such case said board of election commissioners shall cause his name to be printed in the column of the party or political organization from the chairman and secretary of whose committee said board of election commissioners shall have first received notice of such person's nomination for said office, and said board of election commissioners shall not cause the name of such person to be printed on the ballot as a candidate for the same office in any other column."

The relator contends:

1. That this amended law is wholly unconstitutional, for the reason that it discriminates between political parties, and imposes a political test as a condition to one becoming a candidate for office.

2. That if the statute be upheld as constitutional as applied to future elections, in which the opportunity is given to parties and candidates to act under the law, it cannot be so far given retroactive effect as to make it applicable to a case like the present, where the nominations of the parties had been made, and the time within which, under the terms of the act, the candidate is required to make his election as to the place which his name is to have on the ballot had expired before the act took effect.

1. The constitutional question is one of unusual importance, and as the exigencies of the present case demand a prompt decision in order that the rights of the relator may be protected, and as we have reached the conclusion that the act is valid, and within the power of the Legislature, acting under the provisions of article 7, § 6, of the Constitution, which provides that "laws may be passed to preserve the purity of elections and guard against abuses of the elective franchise," and as the relator in the present case is entitled to his remedy without delay, we have thought it best to direct the entry of the order, and withhold a written opinion upon the main point until we shall have the opportunity to formulate our views upon that question, and an opinion upon the full case covering that question will be handed down later.[1]

2. We are of the opinion that the amendatory act of March 14 cannot be held applicable to the present case. The time within which the candidate is authorized by law to exercise his choice of tickets had in the present case expired before the law took effect. He, therefore, under the law, had no opportunity to exercise the right con-

---

[1] See opinion immediately following this.

ferred. If it be attempted to apply the terms of this act
to the present case, the election commissioners would be
bound under the other provisions of the act to print the
name of the candidate on the ticket first certified, thus
excluding wholly the right of choice plainly intended to
be conferred by the statute. The general rule is well set-
tled in this State and elsewhere that all statutes are pros-
pective in their operation, except when a contrary intent
is clearly evidenced by the context. *Heineman v. Schloss,*
83 Mich. 153; *Stitt v. Casterline,* 89 Id. 239; *Smith v.
Pinch,* 80 Id. 332; *Finn v. Haynes,* 37 Id. 63; *Maxwell
v. Bridge Co.,* 46 Id. 278; *Danville Stove & Manufactur-
ing Co. v. Circuit Judge,* 88 Id. 244.

" The rule to be derived from a comparison of a vast
number of judicial utterances upon this subject seems to
be that, even in the absence of constitutional obstacles to
retroaction, a construction giving to a statute a prospective
operation is always to be preferred, unless a purpose to
give it a retrospective force is expressed by clear and pos-
itive command, or to be inferred by necessary, unequivocal,
and unavoidable implication from the words of the statute,
taken by themselves and in connection with the subject-
matter and the occasion of the enactment, admitting of no
reasonable doubt, but precluding all question as to such
intention." End. Interp. Stat. § 271.

Judge Cooley, in his work on Constitutional Limitations,
page 370, referring to this subject, says:

" Legislation of this character is exceedingly liable to
abuse; and it is a sound rule of construction that a statute
should have a prospective operation only, unless its terms
show clearly a legislative intention that it should operate
retrospectively; and some of the states have deemed it just
and wise to forbid such laws altogether by their constitu-
tions."

As is said in Potter's Dwarris on Statutes and Consti-
tutions, in a note on page 163:

" Although the words of the statute are broad enough
in their literal extent to comprehend existing cases, they

must yet be construed as applicable only to cases that may thereafter arise, unless a contrary intention is unequiv-ocally expressed therein."

The act grants the right of choice of tickets, but com-pels the choice within a time which had already expired in the present case when the act took effect, and then in ex-press terms provides that if the choice is not made by the candidate within that time the election commissioners shall print his name in the ticket first certified.    There is no alternative under the act but that, if the choice is not made by the candidate within the time, his name must be printed upon the ticket first certified, and if we hold that the relator may have further time beyond the time fixed by the act we must interpolate something into the statute. If this be done, what time shall be fixed when the relator must make his choice?   What is to guide us in fixing that time?    Certainly not the act itself, but an arbitrary rule which we must adopt, and which is not contained in the act.    It cannot be presumed from the language of the statute that the Legislature intended such a result as that one who could not conform to the provisions of the act, for the reason that the proceedings in his case had so far progressed as to render compliance by him with the terms of the act impossible, should be held within the act.

The writ must issue to the election boards of the counties named, directing such boards to print the relator's name upon all three tickets mentioned.

GRANT and HOOKER, JJ., concurred with LONG, J.

MONTGOMERY, J.   I concur in the foregoing opinion, so far as it holds that the right of the present relator can-not be affected by the provisions of the act of March 14. As this holding disposes of the case, I do not deem it necessary to set forth my views upon the question of the constitutionality of the act.

McGRATH, C. J., did not sit.

The following opinion was filed in the above entitled case on October 1, 1895:

GRANT, J. A brief opinion was filed in this case upon the hearing (*ante*, 474). The provision of the Constitution empowering the Legislature to enact laws to preserve the purity of elections and the provisions of the statute are sufficiently stated in that opinion. For want of time, a written opinion upon the constitutional question was then withheld.

If the effect of this act, as is strenuously argued by the learned counsel for the relator, is to "subvert or impede the right to vote," it is clearly unconstitutional. If, on the contrary, it neither subverts nor impedes, but only regulates, that right, it is constitutional. As experience has disclosed corruption, fraud, venality, and assaults upon the purity of the ballot, the legislatures of the several states have enacted laws to prevent them. Few, if any, of these enactments have escaped attack in the courts, and the charge against them has usually been that they are unconstitutional, and infringe upon the sacred and constitutional rights of the citizen. The registry law of this State was attacked. So, also, were the laws providing for the present system,— the *quasi* Australian ballot. The effect of these laws has been to render voting more inconvenient, to require greater care on the part of the elector, and sometimes to deprive him of his vote. The elector who has failed, through forgetfulness or other reason, to register on the days provided by the law, must lose his vote, unless he was sick or absent from the township on business, and without intent to avoid registration. The elector may not desire to vote for any man upon the ballot, and in that case he must erase the name of the objectionable candidate, and write another name, or mark some name for the same office upon another ticket, or

lose his vote for that office.    He may innocently make certain marks prohibited by law, or he may innocently show his ticket, either of which will cause the loss of his vote.    These and other similar provisions designed to secure an honest election, and to preserve "this most precious right to those who are entitled to enjoy it," have been sustained by the courts.    The Constitution does not guarantee that each voter shall have the same facilities with every other voter in expressing his will at the ballot-box, or, to apply the rule to the present case, it does not guarantee to each voter the right to express his will by a single mark.    The constitutionality of the law is not to be tested by the fact that one voter can cast his ballot by making one mark, while another may be required to make two or more to express his will.    When each has been afforded the opportunity and been provided with reasonable facilities to vote, the Constitution has been complied with.    All else is regulation, and lies in the sound discretion of the Legislature, to whom alone such regulation is committed. Courts cannot hold such provisions unconstitutional because, in their judgment, they are harsh or unwise, or have their origin in partisan purposes.    Constitutional laws often have their origin in such purposes, and unconstitutional laws are often based upon pure motives and honest intentions.    Courts have nothing to do with the motives of legislators, nor the reasons they may have for passing the law.    The polar star of interpretation to guide them is the language of the Constitution itself, and the sole question always is, does the law destroy or abridge the right?

It is well, perhaps, to refer to some of the decisions of this Court as to the power of the Legislature to pass acts to maintain the purity of elections, which is expressly conferred upon them by Const. art. 7, § 6.

104 MICH.—31.

In *Chateau v. Jacob*, 88 Mich. 170, a candidate for alderman claimed the right to have his name appear upon the official ballot as a candidate on the Citizens' Committee's Independent Ticket. He had the right to be a candidate, but it was held he had no right to have his name printed upon the official ballot, because it did not appear that he was selected by any assemblage of electors of his ward, and that anybody could vote for him by writing his name upon the ballot.

In *Common Council v. Rush*, 82 Mich. 532, it was held that parties might place a county ticket upon the official ballot as the law then stood, and, if they desired to vote for any State ticket, they could erase the county ticket, and place their own in its stead. In that case one voter would be put to more trouble in preparing his ballot than another.

In *Attorney General v. May*, 99 Mich. 538, we said that every presumption is in favor of the constitutionality of the law; citing the authorities.

In *Attorney General v. Common Council*, 78 Mich. 545, 559, it was said:

"In order to prevent fraud at the ballot-box, it is proper and legal that all needful rules and regulations be made to that end; but it is not necessary that such rules and regulations shall be so unreasonable and restrictive as to exclude a large number of legal voters from exercising their franchise. * * * The power of the Legislature in such cases is limited to laws regulating the enjoyment of the right, by facilitating its lawful exercise, and by preventing its abuse. The right to vote must not be impaired by the regulation. It must be regulation, not destruction."

In *Common Council v. Rush*, 82 Mich. 532, 537, we held that it was—

"The exclusive province of the Legislature to enact laws providing for the registration of voters, and the time, place,

and manner of conducting elections. It may regulate, but cannot destroy, the enjoyment of the elective franchise. Whether such regulation be reasonable or unreasonable is for the determination of the Legislature, and not for the courts, so long as such regulation does not become destruction. * * * When power is conferred upon the Legislature to provide instrumentalities by which certain objects are to be accomplished, the sole right to choose the means accompanies the power, in the absence of any constitutional provisions prescribing the means. The finding by this Court that the law impeded, hampered, or restricted the right to vote, and is therefore void, would be a clear assumption of, and encroachment upon, legislative power,—a substitution of our judgment for that of the Legislature. It can only be declared void when it destroys the right. Its unconstitutionality can be determined by no other rule."

See, also, *Attorney General v. McQuade*, 94 Mich. 439.

Other decisions by this and other courts might be cited and quoted from, but the above are sufficient to establish the rule by which courts must be governed in determining the constitutionality of acts passed by the Legislature for the purity of elections. The rule is thus stated by Justice COOLEY:

" All such reasonable regulations of the constitutional right which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot-box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them absolutely essential." Cooley, Const. Lim. 602.

See, also, Paine, Elect. § 301.

In the light of this well-established rule, let us examine the official ballot, to ascertain what the voter is required to do in order to cast his vote under this law. When he enters the booth with his ballot, he seeks that portion of it representing his political affiliations. We will assume that the law was in force at the election in question; that relator was first nominated by the Free Silver party; that he

was also the nominee of all the other parties, except the Republican; and that he elected to have his name appear upon the ballot on the Free Silver ticket. The ballot, aside from the vignettes and instructions, would be as shown on next page.

The voter, if he belonged to any other party than the Free Silver or Republican party, would see at a glance that there was no candidate for Congress upon his ticket, and that there were only two candidates for that office upon the ballot. After having made the cross in the space at the head of his party ticket, if he desired to vote for either of the candidates appearing on the ballot he would then make another cross in the square opposite the name. If he desired to vote for neither of these, but for some other man, he would write the name in the blank space on his party ticket. Any voter able to read could in a few seconds prepare his ballot. Is this destructive of the elective franchise? Does it destroy the full, free, and intelligent exercise of that precious right which is essential to the perpetuity of our government? To so hold would be absurd, and further argument cannot make it clearer. To what extent is the voter impeded? If he belongs to the Democratic or Prohibition or People's party, and desires to vote for a congressional candidate, he is required to make two crosses or marks instead of one. If he cannot read, he is certainly not impeded, because the parties sworn to assist him in preparing his ballot will readily inform him upon the subject, and mark it according to his wishes. It would be much more difficult to prepare a ballot under the pure Australian system, where each name must be marked. It would be a serious reflection upon the intelligence of the voters of Michigan to hold that they could be deceived by such a ballot or impeded in the right to vote. Especially is this true in view of the means of disseminating intelligence through the newspapers, upon

## KALAMAZOO COUNTY OFFICIAL BALLOT.

| Name of Office Voted for. | Republican Ticket. | Democratic Ticket. | Prohibition Ticket. | People's Party. | Free Silver Party— 16 to 1. |
|---|---|---|---|---|---|
| **STATE:** Justice of the Supreme Court. | Joseph B. Moore. | John W. McGrath. | Myron H. Walker. | Robbins B. Taylor. | |
| Regents of the University.... | Roger W. Butterfield. | Charles T. Pailthorp. | Noah W. Cheever. | George B. Smith. | |
| | Charles H. Hackley. | Stratton D. Brooks. | Delavan B. Reed. | Varnum J. Bowers. | |
| **CONGRESSIONAL:** Representative in Congress (3rd Congressional District) (To fill Vacancy.) | Alfred Milnes. | | | | Albert M. Todd. |
| **COUNTY:** County Commissioner of Schools----------- | Ashley Clapp. | Russell G. Smith. | Samuel McKee. | Samuel McKee. | |

the hustings, by printed posters, and the importunities of candidates and their friends.

It is, however, said that the voter has the right to suppose that all his party nominees will be on his party ticket. The Constitution neither expressly nor impliedly confers any such right. If he be possessed of any intelligence whatever, he cannot fail to see at once the vacant space upon the ticket, and to know that, if he desires to vote for a Congressman, he must check one of the two candidates, or write a name in the blank space. Both the opportunity and the facility to vote are afforded. If it be said that the voter who does not examine his ticket may by this means be deprived of his vote for an office, it may also be said with equal certainty that, if another candidate than the one nominated by the convention is upon it, he will probably vote for the man who he had no reason to suppose was on his ticket, and for whom he never intended to vote. The ballot prepared under the present law challenges the voter's attention by the vacant space upon his party ticket to the fact that, if he desires to vote for a candidate for that office, he must seek his name upon other tickets, or write a name upon his own ticket.

It is apparent that this law will tend to secure a more intelligent vote than if the name of the candidate were upon all four tickets. It is alleged in the answer that the convention of one of the political parties did not expressly authorize its committee to fill any vacancy, and that its congressional candidate withdrew, and such committee placed the name of the relator upon its ticket. It is alleged by the respondents that corrupt bargains have been made, between unscrupulous managers of different political parties, by which one candidate has been bought off and another substituted, and that new political parties have been organized by unscrupulous men for the sole

purpose of bargain and sale, and that the purpose of this law is to prevent these corrupt deals between corrupt politicians. No fraud is charged in the present case, but it affords an illustration of the opportunities for such trades, which every good citizen condemns, and which should, if possible, be prevented by law.

It is also insisted that the candidate has the constitutional right to have his name appear upon the ticket of every party which indorses him. It gives every candidate the right to have his name appear upon the ticket once. Naturally, it belongs in the column of that party with which he is openly affiliated; but if he chooses to have his name attached to the ticket of some other party, and that party does not object, he possesses that right. But I know of no reason or authority for saying that any candidate possesses the constitutional and inalienable right to have his name appear more than once upon the official ballot containing the tickets of two or more political parties. The Australian ballot contemplates that his name shall be there but once. It follows then that every voter has a reasonable opportunity to vote for him. This is the sole constitutional right guaranteed him. He has no occasion to find fault so long as he is permitted to have his name upon the ballot upon such ticket as he chooses, with the constitutional right following of an opportunity given to every voter to vote for him, which he can do by simply making two crosses instead of one.

The law is general, and aims at no political party. One party may be affected at one election, and another at another, or all parties may be affected at one election, some in one locality and others in another. It does not prevent coalition between different political parties, which is often very commendable and patriotic. It does not deprive the members of those political parties of the means to put their

coalition into effect by their votes, but furnishes all reasonable facilities for so doing. It only requires some degree of intelligence and care on the part of the voters. We hold the law to be constitutional.

LONG and HOOKER, JJ., concurred with GRANT, J. McGRATH, C. J., did not sit.